[Crim. No. 246.   Third Appellate District.—June 25, 1914.]

## THE PEOPLE, Respondent, v. JOHN PEDDE et al., Appellants.

CRIMINAL LAW—ASSAULT WITH DEADLY WEAPON BY PERSONS ESCAPING FROM OFFICER—SUFFICIENCY OF EVIDENCE TO SUPPORT VERDICT.— In this prosecution of two Indians for assaulting with a rifle, with intent to kill, a fish and game warden while they were making their escape from him after he had arrested them for fishing in violation of a county ordinance, the evidence is sufficient to support a verdict of guilty.

ID.—INTENTION OF ACCUSED—QUESTION FOR JURY.—It was for the jury to decide, in view of all the circumstances, whether the Indians intended to escape from lawful arrest, even though it might become necessary to kill one or both of the arresting officers.

ID.—CONSPIRACY TO COMMIT CRIME—PRESUMPTION THAT PARTIES UNDERSTAND CONSEQUENCES.—Where men confederate together to commit crimes of a nature or under such circumstances as will, when tested by human experience, probably result in taking human life, if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presumed that they all undertand the consequences which might be reasonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accomplish the object of the conspiracy.

APPEAL from a judgment of the Superior Court of Lassen County.   H. D. Burroughs, Judge.

The facts are stated in the opinion of the court.

Jamison & Wylie, R. M. Rankin, and T. H. Selvage, for Appellants.    .

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

CHIPMAN, P. J.—It was charged in the information that Wilson Duke, John Pedde, and John Hendricks, at Lassen County, on the twenty-sixth day of April, 1913, with a deadly weapon, to wit, a rifle, made an assault upon the person of F. P. Cady and did then and there shoot and wound, with intent then and there to kill and murder him, the said Cady.

Duke had a separate trial, with what result does not appear. Pedde and Hendricks were jointly tried and the jury rendered a verdict of guilty as charged recommending them to the mercy of the court. Judgment of conviction followed and they were each sentenced to imprisonment for the term of three years at San Quentin. The appeal is from the judgment.

The only claim made for reversal is that the evidence is insufficient to justify the verdict and that no greater offense was shown than simple assault.

The defense of the Indians seems to have been in charge of Mr. T. H. Selvage, deputy U. S. attorney, and the prosecution was conducted by the district attorney of the county.

F. P. Cady and Joseph R. Nelligan were, on April 26, 1913, fish and game wardens. On that day they arrested a party of eleven Indians, old and young, whom they found, about the hour of noon, fishing and having fish in their possession, in violation of a county ordinance, at Cedar Creek, about eight miles from the town of Madeline. After being placed under arrest Nelligan searched each one of the party for arms and fish and found no weapons but all had fish. They left the fishing ground, Cady and Nelligan on foot and the Indians on horseback, Cady in front and Nelligan at the rear of the party. They had gone about one mile to a point, near some buildings, without anything noticeable occurring. What then took place was testified to by Cady and Nelligan. Cady testified that at this point defendant Hendricks was riding beside him, defendant Pedde immediately behind Hendricks,

and Duke directly behind witness, Cady. What occurred will be given in the witness's language: "When you arrived at these buildings what happened there? A. Someone behind and to my right said 'How far are we going?' I looked over my shoulder and said 'To Madeline.' The defendant John Pedde replied, 'Can't go to Madeline, too far.' I then stopped and turned partially around and said 'You have to go to Madeline, that is the nearest place, no other place to take you.' He replied 'Can't go to Madeline, got to talk that over,' and commenced to get off his horse. Q. What did you do then? A. I immediately turned to my left and found Wilson Duke off his horse and so close to me, just putting his hands on me. So close to me that I couldn't get the muzzle of my rifle down to shoot. I then, when I found I could not shoot, raised the rifle to strike him and he caught the barrel of the rifle. Q. Where was John Hendricks and John Pedde at that time? A. Almost at the same instant or so close to it that I could not tell any difference in the time the defendant John Pedde jumped on my back and caught me around the shoulders and Hendricks caught me by this arm. Q. Go on and relate what happened. A. The rifle was taken away from me. Wilson Duke had it and then stepped back sideways from me with the gun in this position, looking back toward the rear where Nelligan was. Q. Toward the rear of the column? A. Yes, sir. Q. What was John Pedde and Hendricks doing then? A. They held on to me and sometimes I was down on my knees and sometimes up until I finally got loose from them. All the time I was trying to get my pistol out that I had in a scabbard. When I got loose they immediately ran. I looked for Wilson Duke and he stood behind a little pile of lumber about perhaps fifteen steps from me. I can't estimate the distance correctly. He was in an upright position with the gun in this position looking back somewhere toward the rear of the column. I looked to see where Nelligan was. Mr. Selvage: We object to this on the ground it is immaterial and irrelevant. There is no charge here in this case against Wilson Duke. Duke is not on trial and the testimony as to what Duke did from this point on is immaterial. The Court: Overruled. A. And saw Nelligan lying on the ground face downward apparently dead. I then shot at Wilson Duke twice without any apparent effect and didn't even make him look around

and notice me. The third time I took a deliberate aim and saw the bullet hit the ground between he and I close to his feet. He immediately turned and raised the gun to shoot and I started and ran for a little building directly below the road and a little distance off to get behind that. As I ran I heard the report of a rifle once when I was part way to the house. Just as I got to the corner of the house and started to turn I heard the report again and the bullet struck me. Q. Where did it strike you? A. In back here and came out here in the side. Q. How were you armed, Mr. Cady? A. With a thirty-thirty Winchester rifle and thirty-two caliber automatic Colt's revolver." . . .

A map was used and different positions of the parties noted on it but no map was sent up with the record. . . . "Q. Now, Mr. Cady, you say that Wilson Duke succeeded in getting this rifle away from you? A. The three of them did. Q. What was John Pedde and John Hendricks doing? Relate what they were doing at that time. A. John Pedde had me around the shoulders partially on my back and round the shoulders and John Hendricks had me pulling on this arm and Hendricks pulling me back from the shoulder, or Pedde on the shoulder. Q. Did you succeed in getting away from them? A. Yes, after a little time. Q. What became of them after you got loose, do you know? A. I don't know. Q. Can you indicate on the map the object there that would represent the little house behind which you ran? A. This one down here. Q. Are you able to approximate the distance of that house from the place where this occurrence took place? A. Approximately—you say where the occurrence took place; you mean from this point? Q. Yes, sir. A. Approximately between forty-five and fifty yards. . . . Q. At the time of this skirmish there what became of the other Indians? A. I don't know. Q. When this shooting or when this shot struck you in the back as you state, did you fall? A. I made one or two short steps and then—I shouldn't say fell. I lay down behind the house. Q. Did you see any of the Indians after that? A. I saw one. Q. Do you know which one it was? A. I could not say positively. To the best of my knowledge it was Hendricks. Q. Where was he? A. Riding a white horse going along the hillside along here and leading a dark colored, bay or brown, horse with an empty saddle." The testimony

of the Indians was that they all took to flight as soon as the shooting commenced.

On cross-examination Cady was asked what Duke did when he got the gun and replied: "Stepped right out still facing me this way. He stepped off sideways with the gun this way looking back in this direction. Q. How did you come to notice he was facing in that particular position when two men had you down or forcing you down? A. It was all in an instant's time and when he got the gun I naturally kept my eye on the gun expecting to see him use it on me. Instead of that he kept looking back the other way and took no further notice of me that I saw. Q. How far did he go? A. I couldn't tell how far it was. Q. There is a lumber pile marked here. A. That represents a lumber pile. Q. We will mark that X5. How far from that point was it to where Wilson Duke went after he got the gun from you? A. How far from which point? Q. From X5." The question was not answered, but later along he estimated it . . . "Q. How long was it after John Pedde and John Hendricks grappled with you that they left you? A. I couldn't tell you. Q. Do you know where they went? A. No sir. Q. Why didn't you watch them? A. I was too busy. Q. They were the ones you were busy with? A. Not after they left me. Q. Why did they leave you? A. I got loose and got the pistol and saw them go. I didn't know where they went, I didn't watch them. Q. Had you forced them loose from you? A. I couldn't tell you. Q. Do you know whether they left you alone and run away? A. I could not say. Q. Did you pay any further attention to them? A. No sir. Q. Why didn't you? A. I was looking for the man with the gun. Q. You knew they were harmless was the reason you didn't pay any further attention to them? A. No sir. The reason was I wanted to see where the man with the gun was. Q. The man with the gun wasn't looking at you? A. Not when I looked at him he wasn't. Q. You pulled a pistol and fired at him? A. Yes sir. Q. He was still looking the other way? A. Yes sir. Q. And you fired again? A. Yes sir. Q. And he was still looking the other way? A. Yes sir. Q. And you fired a third shot? A. Yes sir. Q. And struck the dirt at his feet and threw up dirt at his feet? A. Somewheres in the neighborhood of his feet. Q. And threw up dirt all around him? A. No sir, it didn't throw up dirt all around him. There is

sand there and it threw up a little cloud of sand at his feet.
Q. How close did it strike to his feet? A. I couldn't esti-
mate. Q. And that attracted his attention? A. I presume
so, something did . . . Q. Did you hear any shots during that
time? A. None but my own. Q. When you saw the dirt fly
up and his attention was called to your shot what did he do?
A. I didn't say his attention was attracted by my shot but
what he did was to turn toward me and start to raise the rifle.
Q. Show me where you were standing at the time as near as
you can. I want you to tell us as near as you can. A. As
near as I could judge when I think it over, about fifteen steps
from there in this general direction. That is practically
somewhere near the line between this cabin and the lumber
pile below the road. Q. Mark the place as near as you can
where you think you were. A. Somewheres in this neighbor-
hood. I don't know. Q. We will call it X7. The point
where you were at the time you did the shooting was at X7.
During all this time you were shooting there at Wilson Duke
you stood about at the point that you mentioned, about that
point? A. Somewheres in that neighborhood. Q. During
that time you didn't move? A. I have no recollection of mov-
ing during the time I was shooting. Q. Did you shoot as
rapidly as you could or take pretty careful aim? A. The first
two shots I shot pretty quick. When I saw I had not hit him
I stopped and took deliberate aim. I saw he was not looking
at me and that was the one that struck the ground. Q. How
far did you say you were from him at the time? A. It is a
matter of guess only. A man don't estimate distances on
occasions of that kind, but somewheres from fifteen to twenty
steps . . . Q. When he turned toward you and brought his
gun up on a level did you think he was going to shoot you
then? A. Yes sir. Q. And you ran? A. I did, yes. Q.
When you were shooting at him and saw that he paid no at-
tention to your shots why didn't you run closer to him and
make certain? A. I thought I was close enough. I thought
I was a good enough shot to hit him if the pistol would shoot
all right.''

He testified that he heard two rifle shots before he got be-
hind the cabin. The last shot struck him. ''I presume I
fainted as I didn't see anything for sometime . . . Q. You
didn't hear any shots except—up to the time you quit shoot-
ing you didn't hear any shots except your own? A. No sir.

Q. And from that on you heard no shots except two rifle shots behind you? A. That is all. I swooned immediately. Q. In other words if there was a battle going on between Wilson Duke and Nelligan you didn't hear a shot fired? A. If I did it didn't make any impression on my mind so I could testify to it. Q. At no time did you hear any shots until you commenced firing yourself? A. No sir, I have no recollection of hearing a shot. Q. Up to that time you yourself had not been shot? A. No sir. Q. You don't know whether or not Nelligan was shot when he was laying there? A. No sir. I didn't at that time. I know now. Q. You only know by hearsay now? A. I saw his condition. Q. But you don't know when he was shot? A. No, I don't know the time he was shot. Q. When you got through shooting did you see any Indians about there. A. Only Wilson Duke."

Nelligan testified that when the party stopped near the building and lumber pile mentioned above he was back seventy or eighty feet and heard some conversation in front but distinguished only the word Madeline. "They were talking among themselves but I didn't understand them. Q. What did you see? A. I saw Wilson Duke rush off his horse and rush in on Mr. Cady and then Pedde and Hendricks, one had him by the arm and I saw the other on his back struggling with Frank the last I saw. Q. What, did you do? A. I started to rush up there and just took a few steps and this Wilson Duke had the gun already and stepped out to the side and I run in back of Smokey Charlie's horse and just as I stepped around behind the horse he shot me in the leg. Q. Wilson Duke shot you? A. Yes sir. Q. What did he shoot you with? A. A thirty-thirty, Frank's gun. Q. What did you do? A. It turned me and when I came around I shot at him. Q. Did you fall? A. Yes sir. Q. What was done then? A. The shooting went on. He run for the lumber pile. Q. He, who do you mean by he? A. Wilson Duke. He went in back of that lumber pile and shot me again in the breast. Q. The first time he shot you in the—A. Leg. . . . Q. What else happened? A. I kind of dazed off after that and don't know exactly how long it was but in a few seconds I was in a daze and when I come to he was standing watching me with the rifle up to his shoulder watching me and I slipped my hand in my pocket and took out a shell and inserted it in the automatic and fired and shot him. He

dropped the rifle.   Threw up his hands and dropped the rifle.
Q. Before this did you see Frank Cady? A. I did.   Q.
Where?   A. Ahead of me.   Q. What was he doing?   A.
Scuffling with John Pedde and John Hendricks.   Q. After
this scuffle did you see him after that?   A. Yes sir.   Q.
Where?   A. He started to run toward a building in that
direction.   Q. Tell what you saw.   A. I saw Wilson Duke
shoot at him twice.   Q. When he was running toward the
building?   A. Yes sir.   Q. Wilson Duke was standing at the
lumber pile?   A. Yes sir.   Q. What happened after that?
A. I come to and crawled up and got the rifle and started to
crawl toward the lake.   Q. You say he shot you once in the
leg and then shot your little finger off?   A. The second shot
hit me in the breast.   Q. Explain where that shot hit.   A. It
hit here and come out down in here over my heart.   That is
where the hole was.   They was showing me my heart thump-
ing.   Q. In what position were you when this second shot hit
you?   A. Laying down.   Q. Laying on the ground?   A.
Yes sir.   Q. Watching Wilson Duke?   A. Yes sir.   Q. And
he was standing near the lumber pile?   A. Yes sir.''

Several of the Indians were witnesses at the trial and all
testified that Pedde and Hendricks were not riding next to
Cady, but were back in the group and that Cady struck Duke
with his gun and pulled Duke off his horse.   They also testi-
fied that the first shot was fired by Nelligan.   They all agree
that all the Indians, other than Duke, fled as soon as the shoot-
ing commenced.   The testimony was that Pedde reported the
affray to some white men who went to the place and carried
Cady and Nelligan away.   It also appeared that some of the
Indians returned and carried Duke to his home.   Witnesses
testified and it was admitted by the prosecution that the de-
fendants bore a good reputation for peace and quiet and it
appeared that they were engaged in farming and lived a quiet
and peaceable life.   The jury, however, were authorized to
accept the testimony of the two prosecuting witnesses and
from their description of the encounter arrive at a conclusion.

The question is: Does the evidence warrant the inference
that Pedde and Hendricks made the assault on Cady with in-
tent to murder him?   So far as the assault on Nelligan is
concerned it is no part of the crime charged and the facts re-
lating to it are material only as they shed light upon the
charge that Cady was assaulted with murderous intent.

Cady's testimony was that when he saw Nelligan down Duke was paying no attention to Cady and did not do so until Cady had fired three times at him. Duke then turned upon Cady who ran for cover and Duke shot him in the back. It is not clear from Nelligan's testimony whether all the shots fired at him, Cady, by Duke were from the lumber pile. He thought the first shot that wounded him in the leg was when Duke was about half way from Cady to the lumber pile.

There was no evidence of any concerted action on the part of these three Indians until they were told that they were being taken to Madeline. They replied, "too far, got to talk it over, can't go to Madeline," and, without further parley, according to Cady's testimony, the three immediately dismounted and pounced upon him and Duke got the rifle. Cady testified that they did not try to get his revolver and he did not know whether they knew he had one. Pedde and Hendricks were undoubtedly guilty of an assault and they were guilty of resisting a lawful arrest by an officer in the discharge of his duty and of making their escape from lawful arrest. The tragedy was of short duration and the events followed each other quickly. It was but a few seconds after Duke got the rifle that he commenced firing on Nelligan and the fusillade between the parties was rapid until all three were down. And the testimony of Nelligan was that Duke fired the first shot, from which the jury might well have inferred that he at least intended to use the weapon when he took it from Cady. That the gun was taken pursuant to the concerted purpose of all three Indians, as an aid to their escape from arrest, though that purpose was instantly formed after they were told they must go to Madeline, we think fairly inferable from the evidence. At one point in his testimony Nelligan testified as follows: "Q. Where did you last see Pedde and Hendricks? A. Struggling with Frank Cady. Q. After Wilson Duke had the gun or before? A. After and before both. Q. And you never saw them after that? A. After they were struggling with Frank? Q. Yes. A. Yes, when I was laying on the sand here alongside of the road they were struggling with Frank. Q. After that did you see them? A. No, I didn't." If this be true, defendants must have been struggling with Cady while Duke was shooting at Nelligan. It was for the jury to reconcile this statement with Cady's, who testified that Pedde and Hendricks ran

away or that he did not know where they were after Duke got his rifle.   We cannot say that Nelligan was mistaken in this and if true, it connects Pedde and Hendricks so intimately with the consequences which followed as to make them responsible and equally guilty as aiding and abetting Duke in his part of the conspiracy.   ''All persons concerned in the commission of a crime, whether it be felony or misdemeanor or whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed.''   (Pen. Code, sec. 31.)

It was said, in *People* v. *Brown,* 59 Cal. 345, 352: ''Where men confederate together to commit crimes of a nature or under such circumstances as will, when tested by human experience, probably result in taking human life, if such necessity should arise to thwart them in the execution of their unlawful plans, it must be presumed that they all understand the consequences which might be reasonably expected to flow from carrying into effect their unlawful combination, and to have assented to the taking of human life if necessary to accomplish the object of the conspiracy.''

The circumstances in the case at bar are not so incriminatory as they were in the case cited, yet defendants were engaged in acts punishable as a crime.   (Pen. Code, secs. 69, 148.)   We feel compelled to hold that the facts were sufficient to justify the verdict.   The argument of counsel is based on the statement of Cady that defendants ran away as soon as Duke got the gun and had no part in the shooting.   But, as we have seen, there was evidence that they held Cady while Duke was shooting at Nelligan.   Nelligan was in position to observe the movements and acts of these men and better able to judge of what was taking place prior to his being himself shot than was Cady who was engaged in the personal encounter and being roughly handled by the Indians.   It was for the jury to decide, in view of all the circumstances, whether the Indians intended to escape from lawful arrest even though it might become necessary to kill one or both of the officers.

It is suggested that the feelings of the community at the place of the trial were highly inflamed toward the defendants and that this public sentiment found its way to and influenced

the jury to defendants' prejudice.  There is no evidence in the record pointing in the slightest in that direction.

The judgment is affirmed.

Burnett, J., and Hart, J., concurred.